**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

| | | |
|---|---|---|
| SJK, JMW #1, and JMW #2, Minor | * | |
| Children of Julia Moss, Deceased, | * | |
| by REICO WATTS, as Their Parent | * | |
| and Natural Guardian, | * | |
| | * | |
| Plaintiffs, | * | CIVIL ACTION |
| v. | * | FILE NO. _____ |
| | * | |
| OCONEE COUNTY SHERIFF JAMES A. | * | |
| HALE, JR., in His Official Capacity, and | * | |
| DEPUTIES ANDREW R. HENDERSON | * | |
| and STANLEY M. SWISHER in Their | * | |
| Individual Capacities, | * | |
| | * | |
| Defendants. | * | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Reico Watts and files this Complaint against

Defendants on behalf of the surviving children of Julia Moss, deceased, showing the

Court as follows:

### INTRODUCTION

1.

This is a 42 U.S.C. §1983 action brought under the Fourth Amendment to the

United States Constitution arising from Deputy Henderson's objectively unreasonable

use of deadly force against Julia Moss, as well as Deputy Swisher's failure to

1

intervene to prevent her from being shot and killed by Henderson despite having ample opportunity to do so.  Plaintiffs have also asserted a Fourteenth Amendment claim against both Deputy Henderson and Deputy Swisher for deliberate indifference to Ms. Moss's serious medical and mental health needs.

In addition to said federal constitutional claims, Plaintiffs also bring federal statutory claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 et seq. and §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504") against Henderson and Swisher's employer, the Oconee County Sheriff's Office, which is suable by naming the Sheriff as a Defendant in his official capacity, for failure to make reasonable accommodation for Ms. Moss's mental disability.

Plaintiffs have also asserted state law claims against Henderson for battery, negligence, and violation of the Georgia Constitution, which are governed by legal standards and defenses that are materially different from those under federal law.

## JURISDICTION AND VENUE

2.

This action is brought pursuant to 42 U.S.C. §§1983 and 1988, 42 U.S.C. §1201 *et seq,* 29 U.S.C. §794, and the Fourteenth Amendment of the United States Constitution.  Jurisdiction is founded upon 28 U.S.C. §1331, §1343, and the aforementioned constitutional and statutory provisions.  Plaintiffs further invoke the

pendant or supplemental jurisdiction of this Court to decide claims arising under state law pursuant to 28 U.S.C. §1367.

3.

In any event, jurisdiction over the state law claims is not discretionary because it is also founded upon diversity of citizenship, given that Plaintiff and his children are domiciled in Florida and the Defendants are domiciled in Georgia, and the amount in controversy exceeds the jurisdictional amount required by 28 U.S.C. §1332.

4.

Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because the event giving rise to this claim occurred in Oconee County, Georgia, which is situated within the district and divisional boundaries of the Athens Division of the Middle District of Georgia, and because one or more Defendants reside within said district and division.

5.

All the parties herein are subject to the jurisdiction of this Court.

**PARTIES**

6.

Plaintiffs SJK, JMW #1, and JMW #2[1] are surviving minor children of Julia

---

[1] The children are identified by initials to protect their privacy under Fed. R. Civ. P. 5.2(a). Two of them are also identified by number since they have the same initials.

Moss, who died an untimely death at the age of 40 on September 21, 2020.  Plaintiff

Reico Watts is the biological father and natural guardian of said children who brings

this wrongful death action in that capacity.  Any damages recovered in this action will

be shared equally between said minor Plaintiffs and the other two minor children of

Julia Moss.  All five children are pictured below with Julia shortly before her death:



7.

Julia's other two minor children, whose initials are SPM and CAM, are not

named parties because their legal guardian is unwilling to participate in any litigation,

but they are real parties in interest whose statutory shares of any recovery will be

protected by Plaintiffs' counsel.  All five children are equal beneficiaries under the

4

Georgia Wrongful Death Act and are Julia's sole heirs at law since she was legally divorced at the time of her death and had no other children, natural or adopted.

8.

Defendant Andrew R. Henderson was, at all times relevant herein, an Oconee County deputy sheriff who acted within the scope of his employment and pursuant to the policies and procedures of the Oconee County Sheriff's Office.  Said Defendant is subject to the jurisdiction of this Court and may be served with process by request for waiver of service by First Class Mail sent care of the Oconee County Sheriff's Office, P.O. Box 563, Watkinsville, Georgia 30677.

9.

Defendant Stanley M. Swisher was, at all times relevant herein, an Oconee County deputy sheriff who acted within the scope of his employment and pursuant to the policies and procedures of the Oconee County Sheriff's Office.  Said Defendant is subject to the jurisdiction of this Court and may be served with process by request for waiver of service by First Class Mail sent care of the Oconee County Sheriff's Office, P.O. Box 563, Watkinsville, Georgia 30677.

10.

Defendant James A. Hale, Jr. is the duly elected Sheriff of Oconee County, and as such he is the state constitutional officer responsible for law enforcement in that county.  For purposes of the ADA and Section 505, the Sheriff's Office is a

government agency providing law enforcement services which is, or has been, a recipient of federal funding, but because the Sheriff's Office itself is not an entity with the legal capacity to sue or be sued, this suit is properly filed against the Sheriff in his official capacity, which is tantamount to a suit against his office.

11.

As the legal embodiment of the Oconee County Sheriff's Office, Sheriff James A. Hale, Jr. in his official capacity is the proper Defendant for a suit alleging violations of the ADA and Section 504 based on the acts or omissions of his deputies, as well as his own acts or omissions, since individual employees are not subject to suit under either of those statutory schemes.

12.

As a Defendant sued in his official capacity, Sheriff Hale is subject to the jurisdiction of this Court and may be served with process by request for waiver of service by First Class Mail sent care of the Oconee County Sheriff's Office, P.O. Box 563, Watkinsville, Georgia 30677.

13.

At all times relevant herein, Defendants Henderson and Swisher acted under color of state law. They are sued in their individual capacities only for purposes of the Fourth and Fourteenth Amendment claims under 42 U.S.C. §1983, and Henderson is sued in his individual capacity only for purposes of the state law claims.

14.

Defendant Hale is sued in his official capacity only, and solely for purposes of the disability discrimination claims under the ADA and Section 504, which require that such claims be brought against the agency and not its employees.

**FACTUAL ALLEGATIONS**

15.

On the morning of September 21, 2020, the Defendant deputy sheriffs were dispatched to the scene of a domestic disturbance at 101 Creek View Court, Athens, Georgia, which is located in Oconee County.

16.

Defendant Henderson was first to arrive at the scene, where he stood in the front yard and spoke for several minutes with the occupant of the home, who told Henderson that had had brought Julia Moss home with him the night before, and she had been acting in a bizarre and threatening manner and was refusing to leave. Specifically, she had broken a window and struck the resident in the head with an object, causing him to suffer a minor superficial injury that did not prevent him from standing in the yard and discussing the situation with Henderson for several minutes.

17.

It was clear from this conversation that the woman, Julia Moss, was having a mental health crisis, which is why Henderson decided to call an ambulance for her.

18.

Henderson waited for backup to arrive before entering the house, where Julia was shouting from a back room, but he did not wait for the ambulance to arrive, which both Henderson and Swisher knew was en route.

19.

Once Swisher arrived, both deputies entered the house and Julia, who was shouting nonsensically from a bedroom door down the hall, closed the door behind her. Henderson immediately followed her to the bedroom and slung the door open.

20.

As Henderson stood in the open doorway with Swisher close behind, Julia was sitting on the floor holding a small hand saw used for cutting sheetrock. The saw had coarse teeth that were only capable of causing serious injury if held against a body part and repeatedly sawed back and forth to break the skin. Here is a picture of the sheetrock saw taken by the GBI in its investigation of the incident:



21.

Instead of speaking calmly, giving her space, or otherwise attempting to de-escalate the situation, Henderson drew his pistol, pointed it directly at Julia, and repeatedly shouted commands for her to drop the "knife." She continued to shout incoherently but it was not clear whether she understood his commands or was mentally capable of complying with them.

22.

For several minutes, Henderson continued to point the gun directly at her and to shout commands, as Julia shouted, "In the name of Elohim and Allah, get the hell out of my house!" She was obviously agitated, confused, and mentally impaired.

23.

She called out several times for help from someone whose name sounded like "Tasha," and Henderson responded, "There's nobody named Tasha here. I'm Corporal Henderson from the Sheriff's Office," all while continuing to point the gun and shout commands at an extremely distraught woman was obviously experiencing a mental health crisis.

24.

Julia then asked if she could call someone she knew to come help her, which would have been an appropriate response to a mental health crisis, but rather than backing off and de-escalating the confrontation by either allowing her to make the call

or offering to call someone on her behalf, and rather than leaving her alone in the room and awaiting the arrival of medical personnel, the deputies continued to escalate the confrontation by repeating ineffective commands and continuing to provoke her by pointing a gun directly at her without interruption.

25.

At one point Julia did put the saw on the floor in front of her for several seconds, as shown by the following screenshot from Henderson's bodycam video:



26.

That would have been a perfect opportunity for both deputies to rush in and easily overpower her since their combined weight was three or four times as much as hers, with the option of immobilizing her with a Taser if necessary, but instead of doing so, they continued to stand in the doorway and commanded her to get on her

stomach and crawl toward them as Henderson continued to hold her at gunpoint.

27.

Seeing that Henderson was still pointing the gun at her even though she had put the saw down, Julia responded to what amounted to an assault with a deadly weapon by Henderson by picking up the sheetrock saw again. She became even more agitated, jumping to her feet and throwing clothes and other objects across the room while continuing to shout incoherently.

28.

Finally, she began running across the room toward Henderson, still holding the saw but not wielding it in a manner capable of causing death or serious bodily injury.

29.

Henderson responded to her forward movement by shooting her several times with his gun as Swisher shot her with his Taser.

30.

Even after she was shot and lying motionless on the floor, with the sheetrock saw still clutched firmly in her hands, the deputies continued to shout commands to drop the "knife" and handcuffed her, not commencing CPR until after they determined that her unconscious, handcuffed body no longer had a pulse.

31.

It can be inferred from the fact that Swisher deployed his Taser rather than his

firearm than he did not consider her to be a lethal threat, which authorizes a jury to find that no reasonable officer would have used deadly force under the circumstances.

32.

It was in fact unreasonable for Henderson to use deadly force under the circumstances, and it was also unreasonable for Swisher to fail to communicate that fact to Henderson during the minutes leading up to shooting, when it was clear that Henderson was continuing escalate the situation by pointing his gun at Julia and failing to use standard de-escalation techniques he had been trained in just months earlier – especially given the fact that there was ample time for deliberation and discussion on how to control the situation without resort to the unjustified use of deadly force.

33.

Both deputies either ignored their de-escalation training or failed to follow because it was not given proper emphasis by the Sheriff's Office – which can be inferred because there was no accountability for either deputy's failure to apply such training in this incident – or the training itself was inadequate because it did not properly educate the deputies on the differences between dealing with mentally disturbed individuals and normal criminal suspects. Either way, there was a systemic failure on the part of the Sheriff's Office in developing and implementing proper policies, procedures, and training its deputies on the handling of mental ill suspects,

the importance of de-escalating rather than escalating conflicts with such persons, and otherwise making reasonable accommodation for their mental disability to avoid unnecessary violence by either the officer or the subject.

34.

At one point in the moments before the shooting, Henderson and Swisher did talk about who was going to "go high" and who was going to "go low" when they made physical contact with her, and this is further evidence that Swisher had a reasonable opportunity to intercede and prevent the use of unlawful force by Henderson.

35.

Julia died on the scene as a result of multiple gunshot wounds, which was not only a tragedy for her and her family, but also for the officers involved, who were conditioned by years of unhelpful training and experience to view this call as a crime in progress rather than a mental health emergency, and without proper guidance from the Sheriff's Office in the form of appropriate policies, procedures, and training on the proper handling of mentally disabled persons, they failed to make reasonable accommodation for Julia's obvious mental disability.

36.

The failure to make reasonable accommodation for a citizen's disability is not only a violation of the ADA and Section 504, but it is part of the totality of the

circumstances to be considered in assessing the reasonableness of deadly force under the Fourteenth Amendment and the necessity for deadly force under Georgia law, plus it amounts to deliberate indifference to serious medical needs under the Fourteenth Amendment.

## THEORIES OF RECOVERY

### COUNT I – FOURTH AMENDMENT CLAIM AGAINST DEFENDANT HENDERSON IN HIS INDIVIDUAL CAPACITY

37.

The aforementioned misconduct of Defendant Henderson in using deadly force against Julia Moss under circumstances where it was objectively unreasonable to do so was a violation of the Fourth Amendment of the United States Constitution.

38.

In September 2020, a reasonable law enforcement officer would have known that it was unconstitutional to use deadly force against a mentally disturbed subject for failing to obey verbal commands to drop a nonlethal weapon under circumstances where the subject posed no imminent lethal threat to the officer or any other person, and because those were the circumstances in this case, Defendant Henderson is not entitled to qualified immunity.

39.

The law being clearly established in September 2020 that Defendant Henderson's conduct was an objectively unreasonable use of deadly force in violation

of the Fourth Amendment, Henderson is liable in his individual capacity under 42 U.S.C. §1983 for all damages proximately caused by his violation of Julia's Fourth Amendment rights.

## COUNT II – FOURTH AMENDMENT CLAIM AGAINST DEFENDANT SWISHER IN HIS INDIVIDUAL CAPACITY

40.

At the time of the subject incident in September 2020, the law was also clearly established "that an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's [use of excessive force] can be held liable for his nonfeasance." *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341-42 (11th Cir. 2007); *accord, Bailey v. City of Miami Beach*, 476 Fed. Appx. 193, 196-197 (11th Cir. 2012); *Priester v. City of Riviera Beach*, 208 F.3d 919, 926-28 & n.6 (11th Cir. 2000).

41.

Because Deputy Swisher had ample time and ability to prevent Deputy Henderson from unreasonably using deadly force against Julia Moss but failed to do so, he is also liable for violating the Fourth Amendment.

42.

Because it was a violation of clearly established law for Defendant Swisher not to intercede and prevent the use of deadly force by Defendant Henderson, he is

likewise not entitled to qualified immunity and shares individual liability for the violation of Julia's Fourth Amendment rights.

## COUNT III – FOURTEENTH AMENDMENT CLAIM AGAINST DEFENDANTS HENDERSON AND SWISHER IN THEIR INDIVIDUAL CAPACITIES

43.

The Fourteenth Amendment prohibits sheriffs and their deputies and jailers from acting with deliberate indifference to the serious medical needs, including mental health needs, of those who are in custody or are in the process of being taken into custody.

44.

By recognizing the serious medical needs of Julia Moss yet failing to respond appropriately to those needs by using standard de-escalation techniques, standing down until qualified medical personnel were on the scene, or otherwise treating her as a mental patient rather than a criminal suspect, the above-described conduct of Defendants Henderson and Swisher amounted to deliberate indifference under the Fourteenth Amendment.

45.

In September 2020, it was clearly established law that law enforcement officers have a duty not to act with deliberate indifference to the serious medical and mental health needs of those whom they are taking into custody, and accordingly, Defendants

Henderson and Swisher are not entitled to qualified immunity on Plaintiffs' Fourteenth Amendment claim against them.

## COUNT IV – ADA CLAIM AGAINST SHERIFF IN HIS OFFICIAL CAPACITY

46.

At all times relevant herein, Defendants Henderson and Swisher were aware that the demented woman who was shouting at them from the bedroom floor was mentally ill, and that her failure to comply with their commands was likely due to a mental impairment.

47.

A reasonable law enforcement officer in Defendants' position would have known that Julia Moss was mentally ill, that her behavior was consistent with mental illness, and that reasonable accommodation should be made for her mental condition without escalating the encounter to a deadly force situation.

48.

At all times relevant herein, said Defendants were employed by a governmental entity which engages in offering and providing police services to members of the general public, including but not limited to dealing with mentally ill citizens upon whom Defendants and fellow deputies were occasionally called upon to serve civil commitment orders or otherwise interact with in the usual performance of their law enforcement duties.

49.

The Americans with Disabilities Act (ADA) prohibits discrimination against disabled individuals in the providing governmental services such as law enforcement, and Defendants are agents, employees, or representatives of a governmental entity that is required to comply with the ADA.

50.

At all times during her interaction with Defendants, Julia Moss was a qualified individual with a mental disability under the ADA.

51.

At all times during her interaction with Defendants, Julia Moss was exhibiting behaviors that were incoherent, erratic, uncooperative and/or irrational, all of which were visible manifestations of her disability.

52.

Instead of accommodating Julia's incoherent, erratic, uncooperative and/or irrational behaviors, Defendants refused to provide the required level of accommodation for her mental illness, which ultimately resulted in her death.

53.

The failure to accommodate Julia's disability was intentional and/or deliberately indifferent to his rights under Title II of the ADA and was the proximate cause of her death.

54.

Regardless of whether they were aware of her specific diagnosis, Defendants knew that Julia Moss was delusional, shouting incoherently, and speaking to people who were not there.

55.

It was obvious to Defendants that Julia Moss would have benefitted from mental health services, and they in fact called an ambulance for that purpose which they knew was in route before they confronted her in the bedroom.

56.

Because they had time to deliberate on the fact that they were dealing with a mentally disturbed person, Defendants should have approached the situation as a welfare check rather than a criminal matter, they should have de-escalated rather than escalated the threat level, and they should have sought mental health intervention assistance from qualified personnel – all of which would have been reasonable accommodations under the ADA and other applicable law.

57.

By failing to make reasonable accommodation for Julia's obvious mental disability in their provision of police services to the community, the deputies employed by the office of Sheriff James Hale, Jr. violated Title II of the ADA, by reason of the Sheriff's Office's own systemic failure to develop and implement

appropriate policies, procedures, and training to ensure that reasonable accommodation was made for Julia's mental disability, for which Sheriff Hale in his official capacity is liable for all resulting damages, including Julia's death.

58.

Accordingly, Plaintiffs have alleged that the Sheriff in his official capacity is liable for the systemic failure of the Sheriff's Office to comply with its own statutory duty to make reasonable accommodation under the ADA and Title II of Section 504, irrespective of whether the Sheriff has vicarious liability for the conduct of his employees.

59.

Additionally and alternatively, Plaintiffs also allege that Sheriff Hale in his official capacity *does* have vicarious liability for Henderson and Swisher's refusal to make reasonable accommodation, while acknowledging that the law is unsettled on that point. At the time of the subject incident, the consensus view for two decades had been that *there is vicarious liability* under the ADA and Title II of Section 504, with three Courts of Appeals having ruled accordingly. *See Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574–75 (5th Cir. 2002); *Rosen v. Montgomery Cnty.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001). In the past year, however, the Sixth and Eleventh Circuits have departed from that view, resulting in a 3-2 split among Circuits that needs to be addressed en banc in this

Circuit and ultimately resolved by the Supreme Court. *Compare Jones v. City of Detroit*, 20 F. 4th 1117, 1118 (6th Cir. 2021); *Ingram v. Kubik*, 30 F. 4th 1241 (11th Cir. 2022). This case presents an opportunity to resolve that conflict.

## COUNT V – SECTION 504 CLAIM AGAINST SHERIFF IN HIS OFFICIAL CAPACITY

60.

As a recipient of federal funds, Sheriff James Hale, Jr. in his official capacity is required by Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794) to make reasonable accommodations to persons with disabilities who receive his agency's services. It further requires such recipients to modify all facilities, services, and programs as necessary to accomplish this purpose. Accordingly, Sheriff Hale and the Sheriff's Office are subject to the mandate of Section 504.

61.

For the same reasons that Julia Moss was deemed to have a disability for purposes of the ADA, Julia was also a qualified individual with a disability under Section 504.

62.

The same conduct of Defendants that constituted an ADA violation also constituted a failure to reasonably accommodate Julia's disability under Title II of Section 504.

63.

Defendants' above-described failure to accommodate Julia's disability was intentional and/or deliberately indifferent to her rights under Title II of Section 504, thereby constituting a violation of the Rehabilitation Act by a recipient of federal funds for which Sheriff James Hale, Jr, is liable in his official capacity.

**COUNT VI – STATE LAW CLAIMS AGAINST
DEFENDANT HENDERSON IN HIS INDIVIDUAL CAPACITY**

64.

By using excessive force against Plaintiff's decedent, Defendant Henderson not only violated the Fourth Amendment but also its equivalent provision under the Georgia Constitution, Art. 1, §1, ¶13.  However, any qualified immunity defense asserted by Henderson under the Fourth Amendment would not apply under state law, and Georgia's doctrinally distinct defense of official immunity does not require that the law be clearly established to impose liability for a violation.

65.

Defendant Henderson's use of excessive force against Plaintiff's decedent also amounted to abuse of a person being arrested or taken into custody in violation of the Georgia Constitution, Art. 1, §1, ¶17.  There is no corresponding provision under the federal Constitution.

66.

By using more force than was reasonably necessary for the defense of life under

Georgia's self-defense statute (O.C.G.A. §16-3-21), Defendant Henderson committed a battery as well as breach of a duty imposed by law that constitutes negligence under Title 51 of the Official Code of Georgia Annotated.

67.

The determination of reasonableness under O.C.G.A. §16-3-21 is different than under the Fourth Amendment because that statute requires that the force not only be reasonable, but that it be "necessary" for the defense of human life. While the doctrine of qualified immunity limits Fourth Amendment liability to situations where a reasonable officer would have known that the use of deadly force was a violation of clearly established legal precedent – irrespective of whether there were less extreme alternatives – Georgia law would impose liability where there were other available options and thus deadly force was not necessary. The availability and feasibility of alternatives to deadly force is a question of fact that must be decided by a jury under Georgia law, while Fourth Amendment claims do not make it to a jury unless the court first decides that the law was clearly established.

68.

Unlike qualified immunity under federal law, which is based on whether the law was clearly established, the individual immunity available to law enforcement officers under Georgia law – known as official immunity – only applies in two instances: (1) where the officer's conduct violates a ministerial duty (which does not

apply here because use of force is discretionary), or (2) where the officer acts with actual malice, even in the performance of discretionary duties. Actual malice is defined as acting with specific intent to cause harm or commit a wrongful act.

69.

Because Defendant Henderson intentionally used deadly force when he knew that deadly force was unjustified, he was acting with specific intent to do wrong and to cause an injury, which raises an inference of actual malice for which he is not entitled to official immunity under Georgia law. *Kidd v. Coates*, 271 Ga. 33, 34, 518 S.E. 2d 124, 125 (1999); *Gardner v. Rogers*, 224 Ga. App. 165, 169, 480 S.E.2d 217 (1996).

70.

Defendant Henderson is liable to Plaintiffs under Georgia law for all damages proximately caused by his tortious and unconstitutional misconduct.

**DAMAGES**

71.

As a direct and proximate result of the above-described conduct of Defendants, Plaintiffs' decedent Julia Moss was deprived of her constitutional rights and Defendants are liable for all damages proximately flowing from said deprivation of her rights, including but not limited to decedent's pain and suffering, her mental anguish and emotional distress, and the full value of decedent's life which was tragically ended as a direct consequence of the unconstitutional and tortious conduct

24

of Defendants.

72.

Defendants are liable to Plaintiffs for all of the foregoing injuries and damages in an amount to be proven at trial and determined by the enlightened conscience of fair and impartial jurors.

73.

Plaintiffs are entitled to recover reasonable attorney's fees and expenses of litigation on their federal claims pursuant to 28 U.S.C. §1988, the ADA, and Section 504 of the Rehabilitation Act, in an amount to be determined by the Court post-verdict.

74.

To the extent that Defendants Henderson and Swisher acted willfully, wantonly, or with deliberate indifference to the rights of Julia Moss, Plaintiffs are also entitled to recover punitive damages under both federal and state law in an amount to be determined by the enlightened conscience of fair and impartial jurors.

**WHEREFORE**, Plaintiffs demand the following:

a)   That this action be tried by a jury;

b)   That judgment be entered in favor of Plaintiffs and against Defendants in an amount to be determined by the enlightened conscience of fair and impartial jurors;

c)      That Plaintiffs be awarded attorney's fees and reasonable expenses of

litigation;

d)      That all costs of this action be taxed against Defendants; and

e)      That the Court award any additional or alternative relief as may be

deemed appropriate under the circumstances.

A JURY TRIAL IS DEMANDED.

Respectfully submitted this 17th day of September, 2022.

*/s/ Craig T. Jones*

_____

CRAIG T. JONES
Ga. Bar No. 399476
Attorney for Plaintiffs

CRAIG T. JONES, PC
Post Office Box 129
Washington, GA 30673
(678) 643-0062
craigthomasjones@outlook.com